# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

ADAM ROYCE BIGNELL

Case No. 23-42939-tjt

Debtor.

Chapter 11

Hon. Thomas J. Tucker

_____/

FRANKLIN CAPITAL FUNDING, LLC, a
Delaware limited liability company,
FRANKLIN CAPITAL MANAGEMENT,
LLC, a Michigan limited liability company,
FRANKLIN CAPITAL GROUP, a Michigan
limited liability company

A.P. No.

**COMPLAINT TO
DETERMINE
DISCHARGEABILITY OF
DEBT**

                Plaintiffs,

vs.

ADAM ROYCE BIGNELL,

                Defendant.

_____/

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Franklin Capital Group, LLC, Franklin Capital Funding, LLC, and Franklin Capital Management, LLC states as follows in support of its Complaint to Determine Dischargeability of Debt:

## JURISDICTION AND PARTIES

1.     This adversary proceeding is brought under § 523 of Title 11 of the U.S. Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 4004, 4007, and 7001 to determine the dischargeability of certain debts.

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §157(b)(2)(I) and (J), 28 U.S.C. § 1334, and the general order of reference in this District.

3.     On March 30, 2023, Debtor Adam Royce Bignell ("Debtor") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.

4.     On information and belief, Debtor is an individual who resides and/or conducts business in Oakland County, Michigan.

5.     Franklin Capital Funding, LLC is a Delaware limited liability company that maintains its principal place of business in Oakland County. It is the assignee of all rights, title, and interest in the loan documents described below evidencing loans from its related entity, Franklin Capital Group, LLC, to Borrower. For ease of

reference, Franklin will refer to itself as "Franklin" regardless of whether the loan described before was first originated with Franklin Capital Group, LLC.

6.      Franklin Capital Management, LLC is a Michigan limited liability company that maintains its principal place of business in Oakland County.

7.      This is a core proceeding and venue properly lies in this District under to 28 U.S.C. § 1409.

## GENERAL ALLEGATIONS

8.      Franklin is a private company that makes and services small business loans.

9.      On or about April 7, 2021, Sahb Energy LLC, a Michigan limited liability company ("Borrower) executed and delivered to Franklin a Promissory Note (Term Loan) evidencing a loan in the original principal amount of $1,250,000 ("Note").

10.     On April 7, 2021, Borrower executed and delivered to Franklin Capital Management, LLC an engagement letter ("Engagement Letter") with respect to certain consulting services.

11.     As security for Borrower's indebtedness to Franklin and Franklin Capital Management, LLC, Debtor executed and delivered to Franklin and Franklin Capital Management, LLC, respectively, certain continuing guaranties dated April 7, 2021 ("Guaranties"), in which he guaranteed payment to Franklin of all of Borrower's outstanding indebtedness to Franklin under the Note, and to Franklin Capital

Management, LLC, all of Borrower's obligations under the Engagement Letter. Copies of the Guaranties are attached as **Exhibit A**.

12.     As part of the security for the loan and the obligations under the Engagement Letter, Debtor executed and delivered to Franklin a security agreement dated April 7, 2021 ("Security Agreement"), in which he granted Franklin a security interest in all of his cryptocurrency now or in the future deposited or maintained at Coinbase, Inc. or any affiliate of Coinbase, Inc. (as fully described in the Security Agreement, the "Crypto Collateral"). A copy of the Security Agreement is attached as **Exhibit B**.

13.     Upon information and belief, after receiving the loan proceeds, Debtor began transferring such loan proceeds from Borrower's bank accounts to Debtor's personal bank accounts.

14.     Debtor also used some of the remaining funds in Borrower's bank accounts for personal expenses, including but not limited to landscaping projects, in-ground pool construction, gambling, and personal vacations.

15.     Upon information and belief, Debtor transferred Borrower funds into an account owned by Debtor and Debtor's wife, then removed Debtor's ownership under such account, leaving Borrower funds in the sole possession of Debtor's wife's account.

4

16.     Despite acknowledging and agreeing to use proceeds of the loan for business purposes only, Debtor used the loan proceeds to fund Debtor's personal lifestyle and left Borrower completely undercapitalized to perform its business.

17.     Borrower ceased operations in late 2022 / early 2023, following the loss of its primary customer.

18.     On December 14, 2022, a Confessed Judgment in the amount of $1,105,754.02, plus interest at the contractual rate until the judgment is satisfied was granted to Franklin against Borrower and Debtor. Debtor has not made payments to Plaintiffs under the judgment. A copy of the Confessed Judgement is attached as **Exhibit C**.

19.     On December 14, 2022, a Confessed Judgment in the amount of $38,141.78, plus interest at the contractual rate until the judgment is satisfied was granted to Franklin Capital Management, LLC against Borrower and Debtor. Debtor has not made payments to Plaintiffs under the judgment. A copy of the Confessed Judgement is attached as **Exhibit D**.

20.     In addition to the Security Agreement, securing the Confessed Judgments are two judgment liens dated January 6, 2023 and recorded on January 20, 2023 ("Judgment Liens"). The Judgment Liens are attached as **Exhibit E**.

5

21.     By this Complaint and the various theories of liability asserted, Plaintiffs seek a nondischargeable judgment against Debtor for all sums due by Debtor to Plaintiffs and for attorney fees, costs, and all other recoverable consequential damages.

## COUNT I
## NONDISCHARGEABILITY OF DEBT THAT AROSE THROUGH FRAUD UNDER 11 U.S.C. 523(a)(2)

22.     Plaintiffs re-allege each of the preceding paragraphs.

23.     11 U.S.C. § 523 provides:

Exceptions to discharge

"(a)   **A discharge** under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title **does not discharge an individual debtor from any debt**— (2) **for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by**-- (A) **false pretenses, a false representation, or actual fraud**, other than a statement respecting the debtor's or an insider's financial condition… (B) use of a statement in writing--(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive* * *"
(emphasis added).

24.     Debtor was the sole member of Borrower and, accordingly, is personally liable for its tortious or wrongful content under applicable law.

25.     Debtor made materially false representations to Plaintiffs, including his intention to use the loan proceeds for Borrower's business.

6

26.     Debtor instead used the proceeds for his own benefit on expenses for his personal lifestyle.

27.     Debtor knew these misrepresentations were false when made or made the misrepresentations with gross recklessness as to their truth at the time he made them.

28.     The misrepresentations were made with the intent and purpose of deceiving Plaintiffs to induce them into providing Borrower the loan.

29.     Plaintiffs justifiably relied on Debtor's representations and, by engaging in such misleading conduct, Debtor fraudulently obtained possession of the loan proceeds.

30.     Plaintiffs were damaged by Debtor's materially false statements.

31.     Accordingly, Debtor's liability to Plaintiffs is not dischargeable under 11 U.S.C. § 523(a)(2).

## COUNT II
## NONDISCHARGEABILITY OF DEBT BASED ON
## FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY
## CAPACITY, EMBEZZLEMENT OR LARCENY UNDER 11 U.S.C. 523(a)(4)

32.     Plaintiffs re-allege each of the preceding paragraphs.

33.     11 U.S.C. § 523 provides:

Exceptions to discharge

"(a) **A discharge** under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title **does not discharge an individual debtor from any debt**--
* * *(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

7

(emphasis added)"

34.     Debtor was the sole member of Borrower and, accordingly, is personally liable for its tortious or wrongful content under applicable law.

35.     As the sole member, Debtor was acting in a fiduciary capacity to Borrower.

36.     Debtor caused Borrower to divert company loan proceeds in violation of the loan documents.

37.     Debtor's conduct in converting or embezzling Borrower's property constitutes fraud or defalcation while acting in a fiduciary capacity.

38.     Accordingly, Debtor's liability to Plaintiffs is not dischargeable under 11 U.S.C. § 523(a)(4).

## COUNT III
## NONDISCHARGEABILITY OF DEBT BASED ON
## WILLFUL AND MALICIOUS INJURY UNDER 11 U.S.C. 523(a)(6)

39.     Plaintiffs re-allege each of the preceding paragraphs.

40.     11 U.S.C. § 523 provides:

Exceptions to discharge

"(a) **A discharge** under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title **does not discharge an individual debtor from any debt--**
* * *(6) **for willful and malicious injury by the debtor to another entity or to the property of another entity;**
(emphasis added)."

41.     Debtor is the sole member of Borrower and, accordingly, is personally liable for its tortious or wrongful content under applicable law.

42.     Debtor used his position as the sole member of Borrower to convert Borrower's property.

43.     Through his willful actions to convert or embezzle Borrower's property, Debtor intended to injure Plaintiffs and, in fact, did injure Plaintiffs.

44.     42.     Accordingly, Debtor's liability to Plaintiffs is not dischargeable under 11 U.S.C. § 523(a)(6).

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court determine that debts owed to Plaintiffs by Debtor are nondischargeable. Plaintiffs further request entry of judgment against Debtor in an amount not less than $1,265,937.91, plus all fees and expenses, which is nondischargeable.

BODMAN PLC


By:    /s/   J. Adam Behrendt
         J. Adam Behrendt (P58607)
         Noel J. Ravenscroft (P77729)
Attorneys for Plaintiffs
201 W. Big Beaver, Suite 500
Troy, Michigan 48084
(248) 743-6000
abehrendt@bodmanlaw.com

Dated: July 31, 2023

# Exhibit A

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

**Continuing Guaranty**

**Guaranty:** To induce Franklin Capital Management, LLC (including its successors and assigns, the "Consultant") directly or through any of its branches, offices, subsidiaries, or affiliates to provide or extend certain financial accommodations and Liabilities to SAHB Energy LLC, a Michigan limited liability company (the "Borrower"), and because each of the undersigned (each a "Guarantor") has determined that executing this Guaranty is in its interest and to its financial benefit, the Guarantor absolutely and unconditionally guaranties to the Consultant the full and prompt payment of all Liabilities when due, whether at stated maturity, on demand, by acceleration or otherwise. The Guarantor's obligations under this Continuing Guaranty (this "Guaranty") shall be payable in lawful money of the United States of America.

**Liabilities:** The term "Liabilities" as used in this Guaranty means (i) all obligations, indebtedness and liabilities of the Borrower to the Consultant, and any of its subsidiaries, affiliates or successors, now existing or later arising, including, without limitation, all loans, advances, interest, costs, expenses, fees, overdraft indebtedness, credit card indebtedness, letter of credit indebtedness or lease obligations, (ii) all costs and expenses, including attorneys' fees, that the Consultant may pay or incur in collecting from the Borrower, the Guarantor or any other guarantor of all or any of the Liabilities and for liquidating any collateral, (iii) all monetary obligations incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, including reasonable attorneys' fees, (iv) all "Liabilities" as defined in each of the other Consulting Engagement Documents and (v) all renewals, extensions, modifications, consolidations or substitutions of any of the foregoing, whether the Borrower may be liable jointly with others or individually liable as a debtor, maker, co-maker, drawer, endorser, guarantor, surety or otherwise, and whether voluntarily or involuntarily incurred, known or unknown, due or not due, absolute or contingent, direct or indirect, liquidated or unliquidated. Notwithstanding anything to the contrary in this Guaranty, the term "Liabilities" shall not include any Excluded Swap Obligation (as hereinafter defined). "Excluded Swap Obligation" means any obligation of Borrower to Consultant with respect to a "swap," as defined in Section 1a(47) of the Commodity Exchange Act ("CEA"), if and to the extent that Guarantor's guaranteeing of such swap obligation, or Guarantor's granting of a security interest or lien to secure such swap obligation, is or becomes illegal under the CEA, or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant," as defined in Section 1a(18) of the CEA and the regulations thereunder, at the time such guarantee or grant of such security interest becomes effective with respect to such swap obligation. If any such swap obligation arises under a master agreement governing more than one swap, the foregoing exclusion shall apply only to those swap obligations that are attributable to swaps in respect of which Guarantor's guaranteeing of, or Guarantor's granting of a security interest or lien to secure, such swaps is or becomes illegal.

"Consulting Engagement Documents", as used in this Guaranty, means, collectively, (i) the Engagement Letter, dated as of the date hereof, between Borrower and Consultant and (ii) any guaranty, mortgage, security agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

"Loan Documents", as used in this Guaranty, means, collectively, (i) this Guaranty, (ii) the "Loan Documents" (as defined in the Promissory Note (Term Loan) dated as of the date hereof, made by Borrower in favor of Franklin Capital Group, LLC ("Lender") (the "Note")), (iii) the "Loan Documents" (as defined in the Letter Agreement, dated as of the date hereof, between Borrower and Lender) and (iv) any guaranty, mortgage, security agreement, swap agreements, other interest rate protection agreement, derivative agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

**Limitation:** Guarantor's obligation under this Guaranty is UNLIMITED unless expressly limited in the Additional Terms and Conditions of this Guaranty. Unless expressly limited in the Additional Terms and

Bodman_17556678_2

Conditions of this Guaranty, there is no limit on the liability and obligations of Guarantor under this Guaranty, and this obligation (whether unlimited or limited to the extent specified in the Additional Terms and Conditions) shall include, IN ADDITION TO any limited amount of principal guaranteed, all interest on all Liabilities, and all costs and expenses of any kind incurred by the Consultant in collection efforts against the Borrower and/or the Guarantor or otherwise incurred by the Consultant in any way relating to the Liabilities or this Guaranty, including without limit attorneys' fees. With respect to the limitation, if any, stated in the Additional Terms and Conditions below on the amount of principal guaranteed under this Guaranty, Guarantor agrees that (a) this limitation shall not be a limitation on the amount of Borrower's Liabilities to the Consultant; (b) any payments by the Guarantor shall not reduce the maximum liability of the Guarantor under this Guaranty unless written notice to that effect is actually received by the Consultant at, or prior to, the time of the payment; and (c) the liability of the Guarantor to the Consultant shall at all times be deemed to be the aggregate liability of the Guarantor under this Guaranty and any other guaranties previously or subsequently given to the Consultant by the Guarantor and not expressly revoked, modified or invalidated in writing.

**Continued Reliance.** The Guarantor may terminate its obligation under this Guaranty as to future Liabilities (except as provided below) by (and only by) delivering written notice of termination to the Consultant and receiving from Consultant written acknowledgment of delivery. Such notice shall be effective upon the opening of business on the fifth (5th) day following written acknowledgment of delivery. If terminated, the Guarantor will continue to be liable to the Consultant for any Liabilities created, assumed or committed to at the time the termination becomes effective, and all subsequent renewals, extensions, modifications and amendments of those Liabilities, until all of the same have been fully paid. Termination by any other Guarantor or guarantor shall not release the Guarantor from its obligations under this Guaranty. The Consultant has no duty to give notice of termination by any guarantor or Guarantor to any remaining Guarantors. The Guarantor shall indemnify the Consultant against all claims, damages, costs and expenses, including, without limit, attorney fees, incurred by the Consultant in connection with any suit, claim or action against the Consultant arising out of any modification or termination of a Borrower loan or any refusal by the Consultant to extend additional credit in connection with the termination of this Guaranty.

**Security.** As security for this Guaranty, the Guarantor pledges, assigns and grants to the Consultant a continuing security interest and lien upon and right of setoff as to and in the following described property and all of its additions, substitutions, increments, proceeds and products, whether now owned or later acquired ("Collateral"):

1. All securities and other property of the Guarantor in the custody, possession or control of the Consultant (other than property held by the Consultant solely in a fiduciary capacity);

2. All property or securities declared or acknowledged by the Guarantor to constitute security for any past, present or future liability, direct or indirect, of the Guarantor to the Consultant;

3. All claims of any nature, whether now existing or later acquired, that Guarantor has against Borrower (excepting claims under a deed of trust or mortgage covering California real property), including the right of the Consultant to collect and realize upon such claims; and

4. All balances of deposit accounts of the Guarantor with the Consultant ("deposit account" having the meaning given to it §9-102(a)(29) of the UCC (as defined below)).

The Guarantor agrees that no security now or later held by the Consultant for the payment of any Liabilities, whether from the Borrower, any guarantor, or otherwise, and whether in the nature of a security interest, pledge, lien, assignment, setoff, suretyship, guaranty, indemnity, insurance or otherwise, shall affect in any manner the unconditional obligation of the Guarantor under this Guaranty, and the Consultant, in its sole discretion, without notice to the Guarantor, may release, exchange, enforce and otherwise deal with any security without affecting in any manner the unconditional obligation of the Guarantor under this Guaranty.

Bodman_17556678_2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

The Consultant shall have the right at any time to apply its own debt or liability to the Guarantor in whole or partial payment of this Guaranty or other present or future liabilities of the Guarantor, direct or indirect, without any requirement for mutual maturity.

If the Guarantor fails to pay any amount owing under this Guaranty, the Consultant shall have all of the rights and remedies provided by law or under any other agreement to liquidate or foreclose on and sell the Collateral, including but not limited to the rights and remedies of a secured party under the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"). These rights and remedies shall be cumulative and not exclusive and are further set forth in the Loan Documents.

For purposes of the following paragraphs and the definition of "Liabilities", "any collateral" shall include the Collateral and any other collateral securing the Liabilities.

**Action Regarding Borrower.** If any monies become available that the Consultant can apply to the Liabilities, the Consultant may apply them in any manner it chooses, including but not limited to applying them against Liabilities which are not covered by this Guaranty. The Consultant can take any action against the Borrower, any collateral, or any other person liable for any of the Liabilities. The Consultant can release the Borrower or anyone else from its liability for the Liabilities, either in whole or in part, or release any collateral, and need not perfect a security interest in any collateral. The Consultant does not have to exercise any rights that it has against the Borrower or anyone else, or make any effort to realize on any collateral or right of set-off. If the Borrower requests more credit or any other benefit, the Consultant may grant it and the Consultant may grant renewals, extensions, modifications and amendments of any of the Liabilities and otherwise deal with the Borrower or any other person as the Consultant sees fit and as if this Guaranty were not in effect. The Guarantor's obligations under this Guaranty shall not be released or affected by (a) any act or omission of the Consultant, (b) the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of the Borrower, or any receivership, insolvency, bankruptcy, reorganization, or other similar proceedings affecting the Borrower or any of its assets, or (c) any change in the composition or structure of the Borrower or the Guarantor, including a merger or consolidation with any other person or entity.

**Nature of Guaranty.** This Guaranty is a guaranty of payment and not of collection. The Consultant can insist that the Guarantor pay immediately, and the Consultant is not required to attempt to collect first from the Borrower, any collateral, or any other person liable for any of the Liabilities. The obligation of the Guarantor shall be unconditional and absolute, regardless of the invalidity, irregularity, or unenforceability of any provision of any agreement between the Borrower and the Consultant by reason of bankruptcy, insolvency or other law or order of any kind or for any reason, or the existence of any defense, setoff or counterclaim which the Borrower may assert. This Guaranty shall remain effective whether the Liabilities are from time to time reduced and later increased or entirely extinguished and later reincurred. This Guaranty shall remain effective with respect to successive transactions which shall either continue the Liabilities, increase or decrease the Liabilities, or from time to time create new Liabilities after all or any prior Liabilities have been satisfied, until this Guaranty is terminated in the manner and to the extent provided below.

**Other Guarantors.** If there is more than one Guarantor, their obligations under this Guaranty shall be joint and several. In addition, each Guarantor shall be jointly and severally liable with any other guarantor of any of the Liabilities. Consultant, in its sole discretion, may release any one or more of the Guarantors or other guarantors for any consideration which it deems adequate, and may fail or elect not to prove a claim against the estate of any bankrupt, insolvent, incompetent or deceased Guarantor or other guarantor; and after that, without notice to any Guarantor, the Consultant may extend or renew any or all Liabilities and may permit the Borrower to incur additional Liabilities, in each case, without affecting in any manner the unconditional obligation of the remaining Guarantors. This Guaranty is not conditioned on anyone else executing this or any other guaranty.

**Rights of Subrogation.** The Guarantor subordinates any claim of any nature that it now or later has against the Borrower to and in favor of all Liabilities and agrees not to accept payment or satisfaction of any claim that the Guarantor now or later may have against the Borrower without the prior written consent of the Consultant.

Bodman_17556678_2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

Should any payment, distribution, security, or proceeds, be received by the Guarantor upon or with respect to any claim that the Guarantor now or may later have against the Borrower, the Guarantor shall immediately deliver the same to the Consultant in the form received (except for endorsement or assignment by the Guarantor where required by the Consultant) for application on the Liabilities, whether matured or unmatured, and until delivered the same shall be held in trust by the Guarantor as the property of the Consultant. The Guarantor further agrees that if any payments to the Consultant on any of the Liabilities are in whole or in part invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act or code, state or federal law, common law or equitable doctrine, this Guaranty and the Consultant's interest in any collateral remain in full force and effect (or are reinstated as the case may be) until payment in full of those amounts. Any payment is due on demand.

**Reinstatement.** Notwithstanding any prior revocation, termination, surrender or discharge of this Guaranty (or of any lien, pledge or security interest securing this Guaranty) in whole or in part, the effectiveness of this Guaranty, and of all liens, pledges and security interests securing this Guaranty, shall automatically continue or be reinstated, as the case may be, in the event that any payment received or credit given by the Consultant in respect of the Liabilities is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds or otherwise under any applicable state or federal law, including, without limitation, laws pertaining to bankruptcy or insolvency, in which case this Guaranty, and all liens, pledges and security interests securing this Guaranty, shall be enforceable against the Guarantor as if the returned, disgorged or rescinded payment or credit had not been received or given by the Consultant, and whether or not the Consultant relied upon this payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Guaranty and the liens, pledges and security interests securing it, the Guarantor agrees upon demand by the Consultant, to execute and deliver to the Consultant those documents which the Consultant determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Guarantor to do so shall not affect in any way the reinstatement or continuation. If the Guarantor does not execute and deliver to the Consultant upon demand such documents, the Consultant and each Consultant officer is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of the Guarantor (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Guarantor.

**Waivers.** The Guarantor waives, to the extent not expressly prohibited by applicable law, any right it may have to receive notice of the following matters before the Consultant enforces any of its rights: (a) the Consultant's acceptance of this Guaranty, (b) any credit or other Liabilities that the Consultant extends to the Borrower, (c) any presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment or notice of acceleration of any Indebtedness, any and all other notices to which the Guarantor might otherwise be entitled, and diligence in collecting any Liabilities and (d) any action that the Consultant takes regarding the Borrower, anyone else, any collateral, or any of the Liabilities, which it might be entitled to by law or under any other agreement, including, without limitations, the terms, time and place of any public or private sale of personal property security held from the Borrower or any other person, and the provisions of Section 9-611 or 9-621 of the Michigan or any other applicable Uniform Commercial Code, as the same may be amended, revised or replaced from time to time. The Consultant may waive or delay enforcing any of its rights without losing them. Any waiver shall affect only the specific terms and time period stated in the waiver. No modification, waiver or amendment of this Guaranty shall be effective unless it is in writing and signed by the party against whom it is being enforced.

The Guarantor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the Guarantor under this Guaranty, and acknowledges that each such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Guarantor now or later securing this Guaranty and/or the Liabilities, and acknowledges that as of the date of this Guaranty no such defense or setoff exists. The Guarantor acknowledges that the effectiveness of this Guaranty is subject to no conditions of any kind.

Bodman_17556678_2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

The Guarantor agrees that the Consultant may, once or any number of times, modify the terms of any Liabilities, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Liabilities, or permit the Borrower to incur additional Liabilities, all without notice to the Guarantor and without affecting in any manner the unconditional obligation of the Guarantor under this Guaranty.

**Information.**  The Guarantor delivers this Guaranty based solely on its independent investigation of (or decision not to investigate) the financial condition of Borrower and is not relying on any information furnished by the Consultant.  The Guarantor assumes full responsibility for keeping itself informed of the Borrower's financial condition and assets, and all other circumstances bearing upon the risk of nonpayment of any of the Liabilities and the nature, scope and extent of the Guarantor's risks under this Guaranty, and the Guarantor accepts the full range of risk encompassed by this Guaranty. The Guarantor represents and warrants that it (i) has not relied on any representation of the Consultant as to Borrower's financial condition and assets, creditworthiness, and all other circumstances bearing upon the risk of nonpayment of any of the Liabilities and (ii) has established adequate means of obtaining from the Borrower on a continuing basis financial and other information pertaining to the Borrower's financial condition. The Consultant has no duty to advise the Guarantor of information known to it regarding Borrower's (or any other Guarantor's or guarantor's) operations, condition, assets, liabilities, circumstances or risks, or the occurrence of any default with respect the Liabilities, or otherwise, notwithstanding any effect these facts may have upon the Guarantor's risk under this Guaranty or the Guarantor's rights against the Borrower.

**Representations by Guarantor.**  (a) As of the date of this Guaranty, each Guarantor represents that such Guarantor has not made any qualified dispositions of any of his/her/its property to (i) a trust established under the Qualified Dispositions in Trust Act (codified at MCL 700.1041 et. seq.) ("Act"), or (ii) any other asset protection trust.

Each Guarantor agrees to not make or attempt any qualified dispositions or other distribution or transfers of any of its property into a trust established under the Act, or any other asset protection trust, without obtaining the prior written consent of the Consultant. Consultant's consent to any such requested distribution shall be at the sole and absolute discretion of the Consultant.  Any consent provided by Consultant described in this paragraph shall only be applicable for property identified and disclosed in writing by a Guarantor to Consultant. Consultant's consent shall not be applicable to: (x) any other property of any Guarantor which is not disclosed to Consultant in writing as part of the qualified disposition under the Act; or (y) any other qualified disposition of property under the Act previously attempted or attempted in the future by any Guarantor.

Each Guarantor acknowledges and agrees that if Consultant does not provide its written consent to a Guarantor for a qualified or other disposition under the Act, then such disposition by the Guarantor shall not be valid under the Act with respect to Consultant.

Each Guarantor agrees that such Guarantor has an obligation to disclose immediately in writing to Consultant any qualified dispositions or attempted qualified dispositions to a trust under the Act and any other disposition to an asset protection trust.

Each Guarantor agrees that this Guaranty constitutes a written agreement described in the Act between a transferor and a creditor providing for and establishing the obligations of a transferor as stated in Subsection (11) of Section 5 of the Act.

Each Guarantor's failure to comply with any provisions of this section shall constitute a default, Default or Event of Default, as applicable, under the Consulting Engagement Documents. The Consultant shall have those rights and remedies upon the occurrence of a default, Default or Event of Default, as applicable, as set forth in each applicable Consulting Engagement Document.

The terms used in this Section (a) shall have the meaning ascribed to them in the Act, unless otherwise defined in this Guaranty.

Bodman_17556678_2

(b) The Guarantor represents: (i) that the execution and delivery of this Guaranty and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or any third party; (ii) that this Guaranty is a valid and binding agreement, enforceable according to its terms; and (iii) that all balance sheets, profit and loss statements, and other financial statements furnished by it to the Consultant are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates. Each Guarantor, other than a natural person, further represents: (i) that it is duly organized, existing and in good standing pursuant to the laws under which it is organized; and (ii) that the execution and delivery of this Guaranty and the performance of the obligations it imposes (A) are within its powers and have been duly authorized by all necessary action of its governing body and (B) do not contravene the terms of its articles of incorporation or organization, its by-laws, or any partnership, operating or other agreement governing its affairs.

**Lending Installations.** The Liabilities may be booked at any office, branch, subsidiary or affiliate of the Consultant, as selected by the Consultant. All terms of this Guaranty apply to and may be enforced by or on behalf of any such office, branch, subsidiary or affiliate of the Consultant. Without limiting the rights of the Consultant under applicable law, the Guarantor authorizes the Consultant to apply any sums outstanding to the credit of the Guarantor with any such office, branch, subsidiary or affiliate of the Consultant toward the payment of the Liabilities by the Guarantor under this Guaranty, whether or not all or any part of the Liabilities is then due.

**Notices.** Notice from one party to another relating to this Guaranty shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address or email listed below its signature to this Guaranty by any of the following means: (a) hand delivery, (b) registered or certified mail, postage prepaid, with return receipt requested, (c) first class or express mail, postage prepaid, (d) Federal Express or like overnight courier service or (e) facsimile, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type. Notice made in accordance with this section shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by first class, registered or certified mail, or on the next business day after mailing or deposit with an overnight courier service if delivered by express mail or overnight courier. Notwithstanding the foregoing, notice of termination of this Guaranty shall be deemed received only upon the receipt of actual written notice by the Consultant in accordance with the paragraph above labeled "Continued Reliance." Notice shall be delivered as follows:

If to the Guarantor: at the address below its signature hereto.

If to Consultant:

Franklin Capital Management, LLC
32300 Northwestern Hwy, Suite #200
Farmington Hills, Michigan 48334
Phone: (248) 538-4024
Email: service@franklincapital.net

**Law and Judicial Forum that Apply.** This agreement is governed by Michigan law, without regard to conflict of law principles. The Guarantor irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Guaranty, and the Guarantor irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by the Guarantor related to this Guaranty may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of the Consultant to bring any

6

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

action or proceeding against the Guarantor in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

**Miscellaneous.** The Guarantor's liability under this Guaranty is independent of its liability under any other guaranty previously or subsequently executed by the Guarantor or any one of them, singularly or together with others, as to all or any part of the Liabilities, and may be enforced for the full amount of this Guaranty regardless of the Guarantor's liability under any other guaranty. This Guaranty is binding on the Guarantor's heirs, successors and assigns (including, without limitation, any debtor in possession or trustee in bankruptcy for the Guarantor), and will operate to the benefit of the Consultant and its successors and assigns. The use of headings are included for the convenience of reference only and shall not limit the provisions of this Guaranty for any purpose. This Guaranty, together with each other Loan Document to which the Guarantor is a party, constitutes the entire agreement of the Guarantor and the Consultant with respect to the subject matter of this Guaranty. The Guarantor acknowledges that the Consultant has the right to sell, assign, transfer, negotiate, or grant participations in all or any part of the Liabilities and any related obligations, including, without limit, this Guaranty, without notice to the Guarantor. In the event any one or more provisions of this Guaranty is deemed invalid, illegal or unenforceable in any respect, the remaining provisions of this Guaranty shall continue in full force and effect as if such invalid, illegal or unenforceable provision(s) was not a part of this Guaranty. The Guarantor has knowingly and voluntarily entered into this Guaranty in good faith, and acknowledges that the terms of this Guaranty are reasonable.

**Conflict.** The Guarantor acknowledges that Consultant, its investors, principals and/or affiliates may be (a) providing debt financing, equity capital or other services (including financial advisory or consulting services) to other companies in respect of which the Guarantor may have conflicting interests regarding the transactions described herein or otherwise or (b) engaged in a broad range of transactions (including providing merchant cash advances or merchant consumer financing) that may involve interests that differ from the interests of the Guarantor. Without limiting the foregoing, certain providers of merchant cash advances (including providers who may have provided merchant cash advances to the Borrower), or their principals, may be referral sources to the Consultant and may also be investors in Consultant or an affiliate of Consultant. The Guarantor further acknowledges that neither Consultant, its investors, principals and/or affiliates have any obligation to disclose such interests and transactions to the Guarantor by virtue of any fiduciary, advisory or agency relationship, and the Guarantor waives, to the fullest extent permitted by law, any actual or alleged conflict of interest, and any claims they may have against, Consultant, its investors, principals and/or affiliates, for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that the Consultant, its investors, principals and or affiliates shall have no liability (whether direct or indirect) to the Guarantor in respect of such a conflict of interest or fiduciary duty claim, or to any person alleging a conflict of interest or asserting a fiduciary duty claim on behalf of or in right of the Guarantor, including any creditors thereof. The Guarantor further acknowledges that Consultant is not a fiduciary of the Guarantor.

**Release.** The Guarantor hereby releases the Consultant, its affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters"). Without limiting the generality of the foregoing, the Guarantor hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released. The Guarantor acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. If the Guarantor asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then the Guarantor agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

7

Bodman_17556678_2

**Information Sharing.** The Consultant may provide, without any limitation whatsoever, any information or knowledge the Consultant may have about the Guarantor or any matter relating to this Guaranty and any related documents to any of its subsidiaries or affiliates or their successors, to the Borrower, or to any one or more purchasers or potential purchasers of the Liabilities or this Guaranty or any related documents, and the Guarantor waives any right to privacy the Guarantor may have with respect to such matters. The Guarantor agrees that the Consultant may without notice and at any time sell, negotiate, assign or transfer one or more interests or participations in all or any part of its rights or obligations under the documents evidencing the Liabilities or in this Guaranty to one or more purchasers whether or not related to the Consultant. This Guaranty may only be modified or amended in a written instrument executed by the Consultant and the Guarantor.

**Additional Terms and Conditions**. None.

**Waiver of Jury Trial**. Consultant and the Guarantor acknowledge that the right to a trial by jury is a constitutional right that may be waived. After consulting or being given the opportunity to consult with legal counsel, the Consultant and the Guarantor knowingly and voluntarily waive any right either of them have to a trial by jury in any proceeding (whether sounding in contract or tort) which is in any way connected with this Guaranty, any related agreement or the relationship established under them, or the Liabilities.

[remainder of page intentionally left blank]

Bodman_17556678_2

IN WITNESS WHEREOF, the Guarantor has signed and delivered this Guaranty to the Consultant as of the date first written above.

Guarantor:

*Adam Bignell*

**ADAM BIGNELL**, individually

Address:
31153 W. Chelton Drive,
Beverly Hills, Michigan 48025
Phone: 248-882-1664
Email: adamb@sahbenergy.com

[Signature Page to Continuing Guaranty (17446678)]

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

**Continuing Guaranty**

**Guaranty:** To induce Franklin Capital Group, LLC (including its successors and assigns, the "Lender") directly or through any of its branches, offices, subsidiaries, or affiliates to provide or extend certain financial accommodations and Liabilities to SAHB Energy LLC, a Michigan limited liability company (the "Borrower"), and because each of the undersigned (each a "Guarantor") has determined that executing this Guaranty is in its interest and to its financial benefit, the Guarantor absolutely and unconditionally guaranties to the Lender the full and prompt payment of all Liabilities when due, whether at stated maturity, on demand, by acceleration or otherwise. The Guarantor's obligations under this Continuing Guaranty (this "Guaranty") shall be payable in lawful money of the United States of America.

**Liabilities:** The term "Liabilities" as used in this Guaranty means (i) all obligations, indebtedness and liabilities of the Borrower to the Lender, and any of its subsidiaries, affiliates or successors, now existing or later arising, including, without limitation, all loans, advances, interest, costs, expenses, fees, overdraft indebtedness, credit card indebtedness, letter of credit indebtedness or lease obligations, (ii) all costs and expenses, including attorneys' fees, that the Lender may pay or incur in collecting from the Borrower, the Guarantor or any other guarantor of all or any of the Liabilities and for liquidating any collateral, (iii) all monetary obligations incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, including reasonable attorneys' fees, (iv) all "Liabilities" as defined in each of the other Loan Documents and (v) all renewals, extensions, modifications, consolidations or substitutions of any of the foregoing, whether the Borrower may be liable jointly with others or individually liable as a debtor, maker, co-maker, drawer, endorser, guarantor, surety or otherwise, and whether voluntarily or involuntarily incurred, known or unknown, due or not due, absolute or contingent, direct or indirect, liquidated or unliquidated. Notwithstanding anything to the contrary in this Guaranty, the term "Liabilities" shall not include any Excluded Swap Obligation (as hereinafter defined). "Excluded Swap Obligation" means any obligation of Borrower to Lender with respect to a "swap," as defined in Section 1a(47) of the Commodity Exchange Act ("CEA"), if and to the extent that Guarantor's guaranteeing of such swap obligation, or Guarantor's granting of a security interest or lien to secure such swap obligation, is or becomes illegal under the CEA, or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant," as defined in Section 1a(18) of the CEA and the regulations thereunder, at the time such guarantee or grant of such security interest becomes effective with respect to such swap obligation. If any such swap obligation arises under a master agreement governing more than one swap, the foregoing exclusion shall apply only to those swap obligations that are attributable to swaps in respect of which Guarantor's guaranteeing of, or Guarantor's granting of a security interest or lien to secure, such swaps is or becomes illegal.

"Consulting Engagement Documents", as used in this Guaranty, means, collectively, (i) the Engagement Letter, dated as of the date hereof, between Borrower and Franklin Capital Management, LLC ("Consultant") and (ii) any guaranty, mortgage, security agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

"Loan Documents", as used in this Guaranty, means, collectively, (i) this Guaranty, (ii) the "Loan Documents" (as defined in the Promissory Note (Term Loan) dated as of the date hereof, made by Borrower in favor of Lender (the "Note")), (iii) the "Loan Documents" (as defined in the Letter Agreement, dated as of the date hereof, between Borrower and Lender) and (iv) any guaranty, mortgage, security agreement, swap agreement, other interest rate protection agreement, derivative agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

**Limitation:** Guarantor's obligation under this Guaranty is UNLIMITED unless expressly limited in the Additional Terms and Conditions of this Guaranty. Unless expressly limited in the Additional Terms and

Bodman_17756679_2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

Conditions of this Guaranty, there is no limit on the liability and obligations of Guarantor under this Guaranty, and this obligation (whether unlimited or limited to the extent specified in the Additional Terms and Conditions) shall include, IN ADDITION TO any limited amount of principal guaranteed, all interest on all Liabilities, and all costs and expenses of any kind incurred by the Lender in collection efforts against the Borrower and/or the Guarantor or otherwise incurred by the Lender in any way relating to the Liabilities or this Guaranty, including without limit attorneys' fees. With respect to the limitation, if any, stated in the Additional Terms and Conditions below on the amount of principal guaranteed under this Guaranty, Guarantor agrees that (a) this limitation shall not be a limitation on the amount of Borrower's Liabilities to the Lender; (b) any payments by the Guarantor shall not reduce the maximum liability of the Guarantor under this Guaranty unless written notice to that effect is actually received by the Lender at, or prior to, the time of the payment; and (c) the liability of the Guarantor to the Lender shall at all times be deemed to be the aggregate liability of the Guarantor under this Guaranty and any other guaranties previously or subsequently given to the Lender by the Guarantor and not expressly revoked, modified or invalidated in writing.

**Continued Reliance.** The Guarantor may terminate its obligation under this Guaranty as to future Liabilities (except as provided below) by (and only by) delivering written notice of termination to the Lender and receiving from Lender written acknowledgment of delivery. Such notice shall be effective upon the opening of business on the fifth (5th) day following written acknowledgment of delivery. If terminated, the Guarantor will continue to be liable to the Lender for any Liabilities created, assumed or committed to at the time the termination becomes effective, and all subsequent renewals, extensions, modifications and amendments of those Liabilities, until all of the same have been fully paid. Termination by any other Guarantor or guarantor shall not release the Guarantor from its obligations under this Guaranty. The Lender has no duty to give notice of termination by any guarantor or Guarantor to any remaining Guarantors. The Guarantor shall indemnify the Lender against all claims, damages, costs and expenses, including, without limit, attorney fees, incurred by the Lender in connection with any suit, claim or action against the Lender arising out of any modification or termination of a Borrower loan or any refusal by the Lender to extend additional credit in connection with the termination of this Guaranty.

**Security.** As security for this Guaranty, the Guarantor pledges, assigns and grants to the Lender a continuing security interest and lien upon and right of setoff as to and in the following described property and all of its additions, substitutions, increments, proceeds and products, whether now owned or later acquired ("Collateral"):

1. All securities and other property of the Guarantor in the custody, possession or control of the Lender (other than property held by the Lender solely in a fiduciary capacity);

2. All property or securities declared or acknowledged by the Guarantor to constitute security for any past, present or future liability, direct or indirect, of the Guarantor to the Lender;

3. All claims of any nature, whether now existing or later acquired, that Guarantor has against Borrower (excepting claims under a deed of trust or mortgage covering California real property), including the right of the Lender to collect and realize upon such claims; and

4. All balances of deposit accounts of the Guarantor with the Lender ("deposit account" having the meaning given to it §9-102(a)(29) of the UCC (as defined below)).

The Guarantor agrees that no security now or later held by the Lender for the payment of any Liabilities, whether from the Borrower, any guarantor, or otherwise, and whether in the nature of a security interest, pledge, lien, assignment, setoff, suretyship, guaranty, indemnity, insurance or otherwise, shall affect in any manner the unconditional obligation of the Guarantor under this Guaranty, and the Lender, in its sole discretion, without notice to the Guarantor, may release, exchange, enforce and otherwise deal with any security without affecting in any manner the unconditional obligation of the Guarantor under this Guaranty.

Bodman_17556679_2

The Lender shall have the right at any time to apply its own debt or liability to the Guarantor in whole or partial payment of this Guaranty or other present or future liabilities of the Guarantor, direct or indirect, without any requirement for mutual maturity.

If the Guarantor fails to pay any amount owing under this Guaranty, the Lender shall have all of the rights and remedies provided by law or under any other agreement to liquidate or foreclose on and sell the Collateral, including but not limited to the rights and remedies of a secured party under the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"). These rights and remedies shall be cumulative and not exclusive and are further set forth in the Loan Documents.

For purposes of the following paragraphs and the definition of "Liabilities", "any collateral" shall include the Collateral and any other collateral securing the Liabilities.

**Action Regarding Borrower.** If any monies become available that the Lender can apply to the Liabilities, the Lender may apply them in any manner it chooses, including but not limited to applying them against Liabilities which are not covered by this Guaranty. The Lender can take any action against the Borrower, any collateral, or any other person liable for any of the Liabilities. The Lender can release the Borrower or anyone else from its liability for the Liabilities, either in whole or in part, or release any collateral, and need not perfect a security interest in any collateral. The Lender does not have to exercise any rights that it has against the Borrower or anyone else, or make any effort to realize on any collateral or right of set-off. If the Borrower requests more credit or any other benefit, the Lender may grant it and the Lender may grant renewals, extensions, modifications and amendments of any of the Liabilities and otherwise deal with the Borrower or any other person as the Lender sees fit and as if this Guaranty were not in effect. The Guarantor's obligations under this Guaranty shall not be released or affected by (a) any act or omission of the Lender, (b) the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of the Borrower, or any receivership, insolvency, bankruptcy, reorganization, or other similar proceedings affecting the Borrower or any of its assets, or (c) any change in the composition or structure of the Borrower or the Guarantor, including a merger or consolidation with any other person or entity.

**Nature of Guaranty.** This Guaranty is a guaranty of payment and not of collection. The Lender can insist that the Guarantor pay immediately, and the Lender is not required to attempt to collect first from the Borrower, any collateral, or any other person liable for any of the Liabilities. The obligation of the Guarantor shall be unconditional and absolute, regardless of the invalidity, irregularity, or unenforceability of any provision of any agreement between the Borrower and the Lender by reason of bankruptcy, insolvency or other law or order of any kind or for any reason, or the existence of any defense, setoff or counterclaim which the Borrower may assert. This Guaranty shall remain effective whether the Liabilities are from time to time reduced and later increased or entirely extinguished and later reincurred. This Guaranty shall remain effective with respect to successive transactions which shall either continue the Liabilities, increase or decrease the Liabilities, or from time to time create new Liabilities after all or any prior Liabilities have been satisfied, until this Guaranty is terminated in the manner and to the extent provided below.

**Other Guarantors.** If there is more than one Guarantor, their obligations under this Guaranty shall be joint and several. In addition, each Guarantor shall be jointly and severally liable with any other guarantor of any of the Liabilities. Lender, in its sole discretion, may release any one or more of the Guarantors or other guarantors for any consideration which it deems adequate, and may fail or elect not to prove a claim against the estate of any bankrupt, insolvent, incompetent or deceased Guarantor or other guarantor; and after that, without notice to any Guarantor, the Lender may extend or renew any or all Liabilities and may permit the Borrower to incur additional Liabilities, in each case, without affecting in any manner the unconditional obligation of the remaining Guarantors. This Guaranty is not conditioned on anyone else executing this or any other guaranty.

**Rights of Subrogation.** The Guarantor subordinates any claim of any nature that it now or later has against the Borrower to and in favor of all Liabilities and agrees not to accept payment or satisfaction of any claim that the Guarantor now or later may have against the Borrower without the prior written consent of the Lender.

Bodman_17556679_2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

Should any payment, distribution, security, or proceeds, be received by the Guarantor upon or with respect to any claim that the Guarantor now or may later have against the Borrower, the Guarantor shall immediately deliver the same to the Lender in the form received (except for endorsement or assignment by the Guarantor where required by the Lender) for application on the Liabilities, whether matured or unmatured, and until delivered the same shall be held in trust by the Guarantor as the property of the Lender. The Guarantor further agrees that if any payments to the Lender on any of the Liabilities are in whole or in part invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act or code, state or federal law, common law or equitable doctrine, this Guaranty and the Lender's interest in any collateral remain in full force and effect (or are reinstated as the case may be) until payment in full of those amounts. Any payment is due on demand.

**Reinstatement.** Notwithstanding any prior revocation, termination, surrender or discharge of this Guaranty (or of any lien, pledge or security interest securing this Guaranty) in whole or in part, the effectiveness of this Guaranty, and of all liens, pledges and security interests securing this Guaranty, shall automatically continue or be reinstated, as the case may be, in the event that any payment received or credit given by the Lender in respect of the Liabilities is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds or otherwise under any applicable state or federal law, including, without limitation, laws pertaining to bankruptcy or insolvency, in which case this Guaranty, and all liens, pledges and security interests securing this Guaranty, shall be enforceable against the Guarantor as if the returned, disgorged or rescinded payment or credit had not been received or given by the Lender, and whether or not the Lender relied upon this payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Guaranty and the liens, pledges and security interests securing it, the Guarantor agrees upon demand by the Lender, to execute and deliver to the Lender those documents which the Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Guarantor to do so shall not affect in any way the reinstatement or continuation. If the Guarantor does not execute and deliver to the Lender upon demand such documents, the Lender and each Lender officer is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of the Guarantor (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Guarantor.

**Waivers.** The Guarantor waives, to the extent not expressly prohibited by applicable law, any right it may have to receive notice of the following matters before the Lender enforces any of its rights: (a) the Lender's acceptance of this Guaranty, (b) any credit or other Liabilities that the Lender extends to the Borrower, (c) any presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment or notice of acceleration of any Indebtedness, any and all other notices to which the Guarantor might otherwise be entitled, and diligence in collecting any Liabilities and (d) any action that the Lender takes regarding the Borrower, anyone else, any collateral, or any of the Liabilities, which it might be entitled to by law or under any other agreement, including, without limitations, the terms, time and place of any public or private sale of personal property security held from the Borrower or any other person, and the provisions of Section 9-611 or 9-621 of the Michigan or any other applicable Uniform Commercial Code, as the same may be amended, revised or replaced from time to time. The Lender may waive or delay enforcing any of its rights without losing them. Any waiver shall affect only the specific terms and time period stated in the waiver. No modification, waiver or amendment of this Guaranty shall be effective unless it is in writing and signed by the party against whom it is being enforced.

The Guarantor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the Guarantor under this Guaranty, and acknowledges that each such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Guarantor now or later securing this Guaranty and/or the Liabilities, and acknowledges that as of the date of this Guaranty no such defense or setoff exists. The Guarantor acknowledges that the effectiveness of this Guaranty is subject to no conditions of any kind.

Bodman_17556679_2

The Guarantor agrees that the Lender may, once or any number of times, modify the terms of any Liabilities, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Liabilities, or permit the Borrower to incur additional Liabilities, all without notice to the Guarantor and without affecting in any manner the unconditional obligation of the Guarantor under this Guaranty.

**Information.** The Guarantor delivers this Guaranty based solely on its independent investigation of (or decision not to investigate) the financial condition of Borrower and is not relying on any information furnished by the Lender. The Guarantor assumes full responsibility for keeping itself informed of the Borrower's financial condition and assets, and all other circumstances bearing upon the risk of nonpayment of any of the Liabilities and the nature, scope and extent of the Guarantor's risks under this Guaranty, and the Guarantor accepts the full range of risk encompassed by this Guaranty. The Guarantor represents and warrants that it (i) has not relied on any representation of the Lender as to Borrower's financial condition and assets, creditworthiness, and all other circumstances bearing upon the risk of nonpayment of any of the Liabilities and (ii) has established adequate means of obtaining from the Borrower on a continuing basis financial and other information pertaining to the Borrower's financial condition. The Lender has no duty to advise the Guarantor of information known to it regarding Borrower's (or any other Guarantor's or guarantor's) operations, condition, assets, liabilities, circumstances or risks, or the occurrence of any default with respect the Liabilities, or otherwise, notwithstanding any effect these facts may have upon the Guarantor's risk under this Guaranty or the Guarantor's rights against the Borrower.

**Representations by Guarantor.** (a) As of the date of this Guaranty, each Guarantor represents that such Guarantor has not made any qualified dispositions of any of his/her/its property to (i) a trust established under the Qualified Dispositions in Trust Act (codified at MCL 700.1041 et. seq.) ("Act"), or (ii) any other asset protection trust.

Each Guarantor agrees to not make or attempt any qualified dispositions or other distribution or transfers of any of its property into a trust established under the Act, or any other asset protection trust, without obtaining the prior written consent of the Lender. Lender's consent to any such requested distribution shall be at the sole and absolute discretion of the Lender. Any consent provided by Lender described in this paragraph shall only be applicable for property identified and disclosed in writing by a Guarantor to Lender. Lender's consent shall not be applicable to: (x) any other property of any Guarantor which is not disclosed to Lender in writing as part of the qualified disposition under the Act; or (y) any other qualified disposition of property under the Act previously attempted or attempted in the future by any Guarantor.

Each Guarantor acknowledges and agrees that if Lender does not provide its written consent to a Guarantor for a qualified or other disposition under the Act, then such disposition by the Guarantor shall not be valid under the Act with respect to Lender.

Each Guarantor agrees that such Guarantor has an obligation to disclose immediately in writing to Lender any qualified dispositions or attempted qualified dispositions to a trust under the Act and any other disposition to an asset protection trust.

Each Guarantor agrees that this Guaranty constitutes a written agreement described in the Act between a transferor and a creditor providing for and establishing the obligations of a transferor as stated in Subsection (11) of Section 5 of the Act.

Each Guarantor's failure to comply with any provisions of this section shall constitute a default, Default or Event of Default, as applicable, under the Loan Documents. The Lender shall have those rights and remedies upon the occurrence of a default, Default or Event of Default, as applicable, as set forth in each applicable Loan Document, including without limitation the right to accelerate the payment of any amounts outstanding under the Note.

The terms used in this Section (a) shall have the meaning ascribed to them in the Act, unless otherwise defined in this Guaranty.

5

(b) The Guarantor represents: (i) that the execution and delivery of this Guaranty and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or any third party; (ii) that this Guaranty is a valid and binding agreement, enforceable according to its terms; and (iii) that all balance sheets, profit and loss statements, and other financial statements furnished by it to the Lender are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates. Each Guarantor, other than a natural person, further represents: (i) that it is duly organized, existing and in good standing pursuant to the laws under which it is organized; and (ii) that the execution and delivery of this Guaranty and the performance of the obligations it imposes (A) are within its powers and have been duly authorized by all necessary action of its governing body and (B) do not contravene the terms of its articles of incorporation or organization, its by-laws, or any partnership, operating or other agreement governing its affairs.

**Lending Installations.** The Liabilities may be booked at any office, branch, subsidiary or affiliate of the Lender, as selected by the Lender. All terms of this Guaranty apply to and may be enforced by or on behalf of any such office, branch, subsidiary or affiliate of the Lender. Without limiting the rights of the Lender under applicable law, the Guarantor authorizes the Lender to apply any sums outstanding to the credit of the Guarantor with any such office, branch, subsidiary or affiliate of the Lender toward the payment of the Liabilities by the Guarantor under this Guaranty, whether or not all or any part of the Liabilities is then due.

**Notices.** Notice from one party to another relating to this Guaranty shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address or email listed below its signature to this Guaranty by any of the following means: (a) hand delivery, (b) registered or certified mail, postage prepaid, with return receipt requested, (c) first class or express mail, postage prepaid, (d) Federal Express or like overnight courier service or (e) facsimile, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type. Notice made in accordance with this section shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by first class, registered or certified mail, or on the next business day after mailing or deposit with an overnight courier service if delivered by express mail or overnight courier. Notwithstanding the foregoing, notice of termination of this Guaranty shall be deemed received only upon the receipt of actual written notice by the Lender in accordance with the paragraph above labeled "Continued Reliance." Notice shall be delivered as follows:

> If to the Guarantor: at the address below its signature hereto

> If to Lender:

> > Franklin Capital Group, LLC
> > 32300 Northwestern Hwy, Suite #200
> > Farmington Hills, Michigan 48334
> > Attn: Loan Servicing
> > Phone: (248) 538-4024
> > Email: service@franklincapital.net

**Law and Judicial Forum that Apply.** This agreement is governed by Michigan law, without regard to conflict of law principles. The Guarantor irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in an action or proceeding arising out of or relating to this Guaranty, and the Guarantor irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by the Guarantor related to this Guaranty may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of the Lender to bring any action or

6

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

proceeding against the Guarantor in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

**Miscellaneous.** The Guarantor's liability under this Guaranty is independent of its liability under any other guaranty previously or subsequently executed by the Guarantor or any one of them, singularly or together with others, as to all or any part of the Liabilities, and may be enforced for the full amount of this Guaranty regardless of the Guarantor's liability under any other guaranty. This Guaranty is binding on the Guarantor's heirs, successors and assigns (including, without limitation, any debtor in possession or trustee in bankruptcy for the Guarantor), and will operate to the benefit of the Lender and its successors and assigns. The use of headings are included for the convenience of reference only and shall not limit the provisions of this Guaranty for any purpose. This Guaranty, together with each other Loan Document to which the Guarantor is a party, constitutes the entire agreement of the Guarantor and the Lender with respect to the subject matter of this Guaranty. The Guarantor acknowledges that the Lender has the right to sell, assign, transfer, negotiate, or grant participations in all or any part of the Liabilities and any related obligations, including, without limit, this Guaranty, without notice to the Guarantor. In the event any one or more provisions of this Guaranty is deemed invalid, illegal or unenforceable in any respect, the remaining provisions of this Guaranty shall continue in full force and effect as if such invalid, illegal or unenforceable provision(s) was not a part of this Guaranty. The Guarantor has knowingly and voluntarily entered into this Guaranty in good faith, and acknowledges that the terms of this Guaranty are reasonable.

**Conflict.** The Guarantor acknowledges that Lender, its investors, principals and/or affiliates may be (a) providing debt financing, equity capital or other services (including financial advisory or consulting services) to other companies in respect of which the Guarantor may have conflicting interests regarding the transactions described herein or otherwise or (b) engaged in a broad range of transactions (including providing merchant cash advances or merchant consumer financing) that may involve interests that differ from the interests of the Guarantor. Without limiting the foregoing, certain providers of merchant cash advances (including providers who may have provided merchant cash advances to the Borrower), or their principals, may be referral sources to the Lender and may also be investors in Lender or an affiliate of Lender. The Guarantor further acknowledges that neither Lender, its investors, principals and/or affiliates have any obligation to disclose such interests and transactions to the Guarantor by virtue of any fiduciary, advisory or agency relationship, and the Guarantor waives, to the fullest extent permitted by law, any actual or alleged conflict of interest, and any claims they may have against, Lender, its investors, principals and/or affiliates, for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that the Lender, its investors, principals and or affiliates shall have no liability (whether direct or indirect) to the Guarantor in respect of such a conflict of interest or fiduciary duty claim, or to any person alleging a conflict of interest or asserting a fiduciary duty claim on behalf of or in right of the Guarantor, including any creditors thereof. The Guarantor further acknowledges that Lender is not a fiduciary of the Guarantor.

**Release**. The Guarantor hereby releases the Lender, its affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters"). Without limiting the generality of the foregoing, the Guarantor hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released. The Guarantor acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. If the Guarantor asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then the Guarantor agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

Bodman_17556679_2

**Information Sharing.** The Lender may provide, without any limitation whatsoever, any information or knowledge the Lender may have about the Guarantor or any matter relating to this Guaranty and any related documents to any of its subsidiaries or affiliates or their successors, to the Borrower, or to any one or more purchasers or potential purchasers of the Liabilities or this Guaranty or any related documents, and the Guarantor waives any right to privacy the Guarantor may have with respect to such matters. The Guarantor agrees that the Lender may without notice and at any time sell, negotiate, assign or transfer one or more interests or participations in all or any part of its rights or obligations under the documents evidencing the Liabilities or in this Guaranty to one or more purchasers whether or not related to the Lender. This Guaranty may only be modified or amended in a written instrument executed by the Lender and the Guarantor.

**Additional Terms and Conditions**. None.

**Waiver of Jury Trial**. Lender and the Guarantor acknowledge that the right to a trial by jury is a constitutional right that may be waived. After consulting or being given the opportunity to consult with legal counsel, the Lender and the Guarantor knowingly and voluntarily waive any right either of them have to a trial by jury in any proceeding (whether sounding in contract or tort) which is in any way connected with this Guaranty, any related agreement or the relationship established under them, or the Liabilities.

[remainder of page intentionally left blank]

Bodman_17556679_2

IN WITNESS WHEREOF, the undersigned have caused this Guaranty to be executed as of the date first written above.

Guarantor:

*Adam Bignell*

**ADAM BIGNELL**, individually

Address:
31153 W. Chelton Drive,
Beverly Hills, Michigan 48025
Phone: 248-882-1664
Email: adamb@sahbenergy.com

# Exhibit B

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

## SECURITY AGREEMENT
(Cryptocurrency)

As of April 7, 2021, for value received, the undersigned ("Obligor") grants to Franklin Capital Group, LLC (including its successors and assigns, the "Lender") a continuing security interest and lien (any pledge, assignment, security interest or other lien arising hereunder is sometimes referred to herein as a 'security interest) in the Collateral (as defined below) to secure payment when due, whether by stated maturity, demand acceleration or otherwise, of all existing and future indebtedness ("Indebtedness") to the Lender of SAHB Energy LLC ("Borrower") and/or Obligor. Indebtedness includes without limit any and all obligations or liabilities of the Borrower and/or Obligor to the Lender, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all obligations or liabilities for which the Borrower and/or Obligor would otherwise be liable to the Lender were it not for the invalidity or unenforceability of them by reason of any bankruptcy, insolvency or other law, or for any other reason; any and all amendments, modifications, renewals and/or extensions of any of the above; all costs incurred by Lender in establishing, determining, continuing, or defending the validity or priority of its security interest, or in pursuing its rights and remedies under this Agreement or under any other agreement between Lender and Borrower and/or Obligor or in connection with any proceeding involving Lender as a result of any financial accommodation to Borrower and/or Obligor; and all other costs of collecting Indebtedness, including without limit attorney fees. Obligor agrees to pay Lender all such costs incurred by the Lender, immediately upon demand, and until paid all costs shall bear interest at the highest per annum rate applicable to any of the Indebtedness, but not in excess of the maximum rate permitted by law. Any reference in this Agreement to attorney fees shall be deemed a reference to reasonable fees, costs, and expenses of both in-house and outside counsel and paralegals, whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorney fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise.

1.      As used in this Agreement, the following terms shall have the following respective meanings set forth below:

"**Collateral**" shall mean all of the following property Obligor now or later owns or has an interest in, wherever located:

(a)     all of Obligor's right, title and interest in all cryptocurrency now or in the future deposited or maintained at Coinbase, Inc. or any affiliate of Coinbase, Inc. (collectively, "Coinbase"), and all digital assets, cash, accounts, or other assets now or hereafter deposited or maintained in, or credited to, such Coinbase accounts, and any and all sub-accounts and accounts in substitution or replacement thereof (collectively, the "Coinbase Account");

(b)     all cryptocurrency and digital assets now or in the future owned by Obligor (whether with Coinbase or otherwise);

(c) any other cryptocurrency now or in the future issued with respect to any of the foregoing cryptocurrency as a result of a fork or other event that results in the holders of cryptocurrency receiving additional or replacement cryptocurrency (whether or not such other cryptocurrency is held in, on deposit in or otherwise allocated to the Coinbase Account);

(d) all rights to receive delivery of or withdraw any of the foregoing cryptocurrency and all rights against Coinbase (or other depository or exchange) with respect to the foregoing cryptocurrency; and

(e) all additions, replacements, substitutions, interest, rights of any kind, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Obligor.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

"**Letter Agreement**" shall mean the letter agreement, dated as of the date hereof, between Lender and Borrower (as it may be amended, restated, supplemented or otherwise modified from time to time).

**2. Warranties, Covenants and Agreements.** Obligor warrants, covenants and agrees as follows:

2.1 [Reserved]

2.2 To the extent any portion of the Collateral is of the nature that perfection of Lender's security interest may be accomplished by control under the Uniform Commercial Code, the Coinbase Agreement (as defined below) constitutes exclusive control (as defined in the Uniform Commercial Code) over such Collateral and perfects Lender's security interest in such Collateral by control.

2.3 Obligor shall furnish to Lender, in form and at intervals as Lender may request, any information Lender may reasonably request and allow Lender to examine, inspect, and copy any of Obligor's books and records including, without limit, all documents related to the Collateral. Obligor shall, at the request of Lender, mark its records and the Collateral to clearly indicate the security interest of Lender under this Agreement.

2.4 At the time any Collateral becomes, or is represented to be, subject to a security interest in favor of Lender, Obligor shall be deemed to have warranted that (a) Obligor is the lawful owner of the Collateral and has the right and authority to subject it to a security interest granted to Lender; (b) none of the Collateral is subject to any security interest other than that in favor of Lender or as otherwise permitted in Lender's discretion and there are no financing statements on file, other than in favor of Lender or as permitted in Lender's discretion; (c) there are no financing statements on file, other than in favor of Lender; (d) no person, other

2

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

than Lender, has possession or control (as defined in the Uniform Commercial Code) of any Collateral of such nature that perfection of a security interest may be accomplished by control; and (e) Obligor acquired its rights in the Collateral in the ordinary course of its business.

2.5     Obligor will keep the Collateral free at all times from all claims, liens, security interests and encumbrances other than those in favor of Lender or as permitted in Lender's discretion. Obligor will not, without the prior written consent of Lender, sell, transfer or lease, or permit to be sold, transferred or leased, any or all of the Collateral, except to the extent permitted in Section 7 below.  Lender or its representatives may at all reasonable times inspect the Collateral and may enter upon all premises where the Collateral is kept or might be located.

2.6     Obligor will do all acts and will execute or cause to be executed all writings requested by Lender to establish, maintain and continue a perfected and first security interest of Lender in the Collateral.  Obligor agrees that Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether realty or personalty, to secure payment of the Indebtedness, and Obligor is not relying upon assets in which the Lender may have a lien or security interest for payment of the Indebtedness.

2.7     Obligor will pay within the time that they can be paid without interest or penalty all taxes, assessments and similar charges which at any time are or may become a lien, charge, or encumbrance upon any Collateral, except to the extent contested in good faith and bonded in a manner satisfactory to Lender. If Obligor fails to pay any of these taxes, assessments, or other charges in the time provided above, Lender has the option (but not the obligation) to do so and Obligor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any Indebtedness.

2.8     [Reserved]

2.9     [Reserved]

2.10    If at any time the market value of the Collateral maintained in the Coinbase Account drops below 100% of the aggregate outstanding principal and accrued but unpaid interest under the Term Loan (as defined in the Letter Agreement) (and any other loan made by Lender to Borrower after the date hereof) less funds held in the Cash Collateral Account (as defined in the Letter Agreement) (together, the "Outstanding Obligations") for three consecutive business days, Obligor may, within one business day after such three business day period, deposit additional cryptocurrency (of a type permitted by Lender in its sole discretion) in an amount necessary to cause the total market value of the Collateral maintained in the Coinbase Account to be at least 125% of the Outstanding Obligations.

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

2.11   If Lender, acting in its sole discretion, redelivers Collateral to Obligor or Obligor's designee for the purpose of (a) the ultimate sale or exchange thereof; or (b) presentation, collection, renewal, or registration of transfer thereof; or (c) loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with it preliminary to sale or exchange; such redelivery shall be in trust for the benefit of Lender and shall not constitute a release of Lender's security interest in it or in the proceeds or products of it unless Lender specifically so agrees in writing. If Obligor requests any such redelivery, Obligor will deliver with such request a duly executed financing statement in form and substance satisfactory to Lender. Any proceeds of Collateral coming into Obligor's possession as a result of any such redelivery shall be held in trust for Lender and immediately delivered to Lender for application on the Indebtedness. Lender may (in its sole discretion) deliver any or all of the Collateral to Obligor, and such delivery by Lender shall discharge Lender from all liability or responsibility for such Collateral.  Lender, at its option, may require delivery of any Collateral to Lender at any time with such endorsements or assignments of the Collateral as Lender may request.

2.12   At any time and without notice, Lender may (a) cause any or all of the Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect by legal proceedings or otherwise all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of the Collateral, and hold the same as Collateral, or apply the same to the Indebtedness, the manner and distribution of the application to be in the sole discretion of Lender; (c) enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting the Collateral, and deposit or surrender control of the Collateral, and accept other property in exchange for the Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such actions in its own name, or in Obligor's name, as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the Uniform Commercial Code) over any Collateral of such nature that perfection of Lender's security interest may be accomplished by control.

2.13   Lender may assign any of the Indebtedness and deliver any or all of the Collateral to its assignee, who then shall have with respect to Collateral so delivered all the rights and powers of Lender under this Agreement, and after that Lender shall be fully discharged from all liability and responsibility with respect to Collateral so delivered.

2.14   Obligor delivers this Agreement based solely on Obligor's independent investigation of (or decision not to investigate) the financial condition of Borrower and is not relying on any information furnished by Lender. Obligor assumes full responsibility for obtaining any further information concerning the Borrower's financial condition, the status of the Indebtedness or any other matter which the undersigned may deem necessary or appropriate now or later. Obligor waives any duty on the part of Lender, and agrees that Obligor is not relying upon

4

Bodman_17559263_5

nor expecting Lender to disclose to Obligor any fact now or later known by Lender, whether relating to the operations or condition of Borrower, the existence, liabilities or financial condition of any guarantor of the Indebtedness, the occurrence of any default with respect to the Indebtedness, or otherwise, notwithstanding any effect such fact may have upon Obligor's risk or Obligor's rights against Borrower.  Obligor knowingly accepts the full range of risk encompassed in this Agreement, which risk includes without limit the possibility that Borrower may incur Indebtedness to Lender after the financial condition of Borrower, or Borrower's ability to pay debts as they mature, has deteriorated.

2.15    Obligor shall defend, indemnify and hold harmless Lender, its employees, agents, shareholders, affiliates, officers, and directors from and against any and all claims, damages, fines, expenses, liabilities or causes of action of whatever kind, including without limit consultant fees, legal expenses, and attorney fees, suffered by any of them as a direct or indirect result of any actual or asserted violation of any law, including, without limit, Environmental Laws, or of any remediation relating to any property required by any law, including without limit Environmental Laws.

3.    **Collection of Proceeds.**  Obligor agrees to collect and enforce payment of all Collateral until Lender shall direct Obligor to the contrary.  Immediately upon notice to Obligor by Lender and at all times after that, Obligor agrees to fully and promptly cooperate and assist Lender in the collection and enforcement of all Collateral and to hold in trust for Lender all payments received in connection with Collateral and from the sale, lease or other disposition of any Collateral, all rights by way of suretyship or guaranty and all rights in the nature of a lien or security interest which Obligor now or later has regarding Collateral.  Immediately upon and after such notice, Obligor agrees to (a) endorse to Lender and immediately deliver to Lender all payments received on Collateral or from the sale, lease or other disposition of any Collateral or arising from any other rights or interests of Obligor in the Collateral, in the form received by Obligor without commingling with any other funds, and (b) immediately deliver to Lender all property in Obligor's possession or later coming into Obligor's possession through enforcement of Obligor's rights or interests in the Collateral.  Obligor irrevocably authorizes Lender or any Lender employee or agent to endorse the name of Obligor upon any checks or other items which are received in payment for any Collateral, and to do any and all things necessary in order to reduce these items to money.  Lender shall have no duty as to the collection or protection of Collateral or the proceeds of it, nor as to the preservation of any related rights, beyond the use of reasonable care in the custody and preservation of Collateral in the possession of Lender. Obligor agrees to take all steps necessary to preserve rights against prior parties with respect to the Collateral.  Nothing in this Section 3 shall be deemed a consent by Lender to any sale, lease or other disposition of any Collateral.

4.    **Defaults, Enforcement and Application of Proceeds.**

4.1    Upon the occurrence of any of the following events (each an "Event of Default"), Obligor shall be in default under this Agreement:

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

(a)    Any failure to pay the Indebtedness or any other indebtedness when due, or such portion of it as may be due, by acceleration or otherwise; or

(b)    Any failure or neglect to comply with, or breach of or default under, any term of this Agreement, or any other agreement or commitment between Borrower, Obligor, or any guarantor of any of the Indebtedness ("Guarantor") and Lender; or

(c)    Any warranty, representation, financial statement, or other information made, given or furnished to Lender by or on behalf of Borrower, Obligor, or any Guarantor shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; or

(d)    Any loss, theft, substantial damage or destruction to or of any Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Borrower, Obligor, any Guarantor, or any Collateral; or

(e)    Sale or other disposition by Borrower, Obligor, or any Guarantor of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Borrower, Obligor, or any Guarantor, or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower, Obligor, or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Borrower, Obligor, or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower, Obligor, or any Guarantor; or

(f)    (i) There is any revocation or termination or notice of intended revocation or termination of the Coinbase Agreement or Lender's rights as an authorized user of the Coinbase Agreement without the prior written consent of the Lender or (ii) the Coinbase Agreement or this Agreement becomes unenforceable or Borrower or Obligor (or Obligor or Borrower makes any claim to that effect) or fails to constitute a perfected security interest in the Collateral in favor of Lender; or

(g)    A general suspension in buying, selling or owning cryptocurrency by U.S. federal governmental authorities or a suspension in buying, selling or owning digital assets or cryptocurrencies on at least three (3) major exchanges (including Coinbase, Inc., GDAX, Kraken, or Bitstamp), with such disruption lasting at least five (5) days; or

(h)    The market value of the Collateral maintained in the Coinbase Account drops below 100% of the Outstanding Obligations for three consecutive

Bodman_17559263_5

business days; subject to such cure rights Obligor has under Section 2.10; or

(i) Lender deems the margin of Collateral insufficient or itself insecure, in good faith believing that the prospect of payment of the Indebtedness or performance of this Agreement is impaired or shall fear deterioration, removal, or waste of Collateral; or

(j) A default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Indebtedness.

4.2 Upon the occurrence of any Event of Default, Lender may at its discretion and without prior notice to Obligor declare any or all of the Indebtedness to be immediately due and payable and Lender shall have and may exercise any one or more of the following rights and remedies:

(a) Exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law;

(b) Institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Indebtedness, and to collect the same out of any Collateral or the proceeds of any sale of it;

(c) Institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral; and/or

(d) Personally or by agents, attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other dispositions, at places and times and on terms and conditions as Lender may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Lender to sell, lease, or otherwise dispose of the Collateral or as to the application by Lender of the proceeds of sale or otherwise, which would otherwise be required by, or available to Obligor under, applicable law are expressly waived by Obligor to the fullest extent permitted.

At any sale pursuant to this Section 4.2, whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Lender or a public officer under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained

Bodman_17559263_5

in any conveyances and receipts made and given by Lender or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal of and interest on the Indebtedness, the accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Lender shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against Obligor with respect to that Collateral. At any sale or other disposition of Collateral pursuant to this Section 4.2, Lender disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including without limit a disclaimer of any warranty relating to title, possession, quiet enjoyment of the like, and Lender may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable.

4.3     Obligor shall at the request of Lender, notify the account debtors or obligors of Lender's security interest in any Collateral and direct payment of it to Lender. Lender may, itself, upon the occurrence of any Event of Default so notify and direct any account debtor or obligor. At the request of Lender, whether or not an Event of Default has occurred, Obligor shall immediately take such actions as Lender shall request to establish exclusive control (as defined in the Uniform Commercial Code) by Lender over any Collateral which is of such a nature that perfection of a security interest may be accomplished by control.

4.4     The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Lender first upon all expenses authorized by the Uniform Commercial Code and all reasonable attorney fees and legal expenses incurred by Lender; the balance of the proceeds of the sale or other disposition shall be applied in the payment of the Indebtedness, first to interest, then to principal, then to remaining Indebtedness and the surplus, if any, shall be paid over to Obligor or to such other person(s) as may be entitled to it under applicable law. Obligor shall remain liable for any deficiency, which it shall pay to Lender immediately upon demand. Obligor agrees that Lender shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Lender agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Lender may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Lender may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Lender.

Bodman_17559263_5

4.5    Nothing in this Agreement is intended, nor shall it be construed, to preclude Lender from pursuing any other remedy provided by law for the collection of the Indebtedness or for the recovery of any other sum to which Lender may be entitled for the breach of this Agreement by Obligor. Nothing in this Agreement shall reduce or release in any way any rights or security interests of Lender contained in any existing agreement between Borrower, Obligor, or any Guarantor and Lender.

4.6    No waiver of default or consent to any act by Obligor shall be effective unless in writing and signed by an authorized officer of Lender. No waiver of any default or forbearance on the part of Lender in enforcing any of its rights under this Agreement shall operate as a waiver of any other default or of the same default on a future occasion or of any rights.

4.7    Obligor (a) irrevocably appoints Lender or any agent of Lender (which appointment is coupled with an interest) the true and lawful attorney of Obligor (with full power of substitution) in the name, place and stead of, and at the expense of, Obligor and (b) authorizes Lender or any agent of Lender, in its own name, at Obligor's expense, to do any of the following, as Lender, in its sole discretion, deems appropriate:

    (i)    to demand, receive, sue for, and give receipts or acquittances for any moneys due or to become due with respect to any Collateral (including without limit to draft against Collateral) and to endorse any item representing any payment on or proceeds of the Collateral;

    (ii)    to execute and file in the name of and on behalf of Obligor all financing statements or other filings deemed necessary or desirable by Lender to evidence, perfect, or continue the security interests granted in this Agreement; and

    (iii)    to do and perform any act on behalf of Obligor permitted or required under this Agreement.

4.8    Upon the occurrence of an Event of Default, Obligor also agrees, upon request of Lender, to assemble the Collateral and make it available to Lender at any place designated by Lender which is reasonably convenient to Lender and Obligor, including, without limitation, consenting to any action or instruction that Lender requests under the Coinbase Agreement, and/or transferring additional Collateral to the Coinbase Account subject to the Coinbase Agreement.

4.9    The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under Section 9.615 (f) of the Uniform Commercial Code (as in effect on or after July 1, 2001): (a) the Collateral which is the subject matter of the disposition  shall be valued in an "as is" condition as

9

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

of the date of the disposition, without any assumption or expectation that such Collateral will be repaired or improved in any manner; (b) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (c) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorneys' fees, whether inside or outside counsel is used, and marketing costs; and (d) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (c) above), and other maintenance, operational and ownership expenses. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under Section 9-615(f).

5.  **Miscellaneous.**

5.1   Until Lender is advised in writing by Obligor to the contrary, all notices, requests and demands required under this Agreement or by law shall be given to, or made upon, Obligor at the first address indicated in Section 5.15 below.

5.2   Obligor will give Lender not less than 90 days prior written notice of all contemplated changes in Obligor's name, chief executive office location, and/or location of any Collateral, but the giving of this notice shall not cure any Event of Default caused by this change.

5.3   Lender assumes no duty of performance or other responsibility under any contracts contained within the Collateral.

5.4   Lender has the right to sell, assign, transfer, negotiate or grant participations or any interest in, any or all of the Indebtedness and any related obligations, including without limit this Agreement. In connection with the above, but without limiting its ability to make other disclosures to the full extent allowable, Lender may disclose all documents and information which Lender now or later has relating to Obligor, the Indebtedness or this Agreement, however obtained. Obligor further agrees that Lender may provide information relating to this Agreement or relating to Obligor to the Lender's parent, affiliates, subsidiaries, and service providers.

5.5   In addition to Lender's other rights, any indebtedness owing from Lender to Obligor can be set off and applied by Lender on any Indebtedness at any time(s) either before or after maturity or demand without notice to anyone.

5.6   Obligor waives any right to require the Lender to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

sale of personal property security held from Borrower or any other person, or otherwise comply with the provisions of Section 9-611 or 9-621 of the Uniform Commercial Code; or (c) pursue any other remedy in the Lender's power. Obligor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Indebtedness, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Indebtedness, and agree(s) that the Lender may, once or any number of times, modify the terms of any Indebtedness, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Indebtedness, or permit Borrower to incur additional Indebtedness, all without notice to Obligor and without affecting in any manner the unconditional obligation of Obligor under this Agreement. Obligor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of Obligor under this Agreement, and acknowledges that such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from Obligor now or later securing the Indebtedness, and acknowledges that as of the date of this Agreement no such defense or setoff exists.

5.7    Obligor waives any and all rights (whether by subrogation, indemnity, reimbursement, or otherwise) to recover from Borrower any amounts paid or the value of any Collateral given by Obligor pursuant to this Agreement.

5.8    In the event that applicable law shall obligate Lender to give prior notice to Obligor of any action to be taken under this Agreement, Obligor agrees that a written notice given to Obligor at least ten days before the date of the act shall be reasonable notice of the act and, specifically, reasonable notification of the time and place of any public sale or of the time after which any private sale, lease, or other disposition is to be made, unless a shorter notice period is reasonable under the circumstances. A notice shall be deemed to be given under this Agreement when delivered to Obligor or when placed in an envelope addressed to Obligor and deposited, with postage prepaid, in a post office or official depository under the exclusive care and custody of the United States Postal Service or delivered to an overnight courier. The mailing shall be by overnight courier, certified, or first class mail.

5.9    Notwithstanding any prior revocation, termination, surrender, or discharge of this Agreement in whole or in part, the effectiveness of this Agreement shall automatically continue or be reinstated in the event that any payment received or credit given by Lender in respect of the Indebtedness is returned, disgorged, or rescinded under any applicable law, including, without limitation, bankruptcy or insolvency laws, in which case this Agreement, shall be enforceable against Obligor as if the returned, disgorged, or rescinded payment or credit had not been received or given by Lender, and whether or not Lender relied upon this payment or credit or changed its position as a consequence of it. In the event of

11

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

continuation or reinstatement of this Agreement, Obligor agrees upon demand by Lender to execute and deliver to Lender those documents which Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Obligor to do so shall not affect in any way the reinstatement or continuation.

5.10   This Agreement and all the rights and remedies of Lender under this Agreement shall inure to the benefit of Lender's successors and assigns and to any other holder who derives from Lender title to or an interest in the Indebtedness or any portion of it, and shall bind Obligor and the heirs, legal representatives, successors, and assigns of Obligor. Nothing in this Section 5.10 is deemed a consent by Lender to any assignment by Obligor.

5.11   If there is more than one Obligor, all undertakings, warranties and covenants made by Obligor and all rights, powers and authorities given to or conferred upon Lender are made or given jointly and severally.

5.12   Except as otherwise provided in this Agreement, all terms in this Agreement have the meanings assigned to them in Article 9 (or, absent definition in Article 9, in any other Article) of the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means Act No. 174 of the Michigan Public Acts of 1962, as amended, revised or replaced from time to time, including without limit as amended by Act No. 348 of the Michigan Public Acts of 2000. Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

5.13   No single or partial exercise, or delay in the exercise, of any right or power under this Agreement, shall preclude other or further exercise of the rights and powers under this Agreement. The unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement. This Agreement constitutes the entire agreement of Obligor and Lender with respect to the subject matter of this Agreement. No amendment or modification of this Agreement shall be effective unless the same shall be in writing and signed by Obligor and an authorized officer of Lender. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without regard to conflict of laws principles.

Bodman_17559263_5

5.14  To the extent that any of the Indebtedness is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of that Indebtedness nor shall anything contained in this Agreement prevent Lender from making demand, without notice and with or without reason, for immediate payment of any or all of that Indebtedness at any time(s), whether or not an Event of Default has occurred.

5.15  Obligor represents and warrants that Obligor's exact name is the name set forth in this Agreement. Obligor further represents and warrants and agrees that Obligor is an individual, and at all times shall be, located (as determined pursuant to the Uniform Commercial Code) at Obligor's principal residence which is 31153 W. Chelton Drive, Beverly Hills, Michigan.

5.16  A carbon, photographic, .pdf or other reproduction of this Agreement shall be sufficient as a financing statement under the Uniform Commercial Code and may be filed by Lender in any filing office.

5.17  This Agreement shall be terminated only by the filing of a termination statement in accordance with the applicable provisions of the Uniform Commercial Code, but the obligations contained in Section 2.13 of this Agreement shall survive termination.

6.  **OBLIGOR AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE INDEBTEDNESS.**

7.  **Special Provisions Applicable to this Agreement.**

(a)  The Coinbase Account will be established with Coinbase and may be subject to certain terms and conditions of the Coinbase platform, including without limitation, the allocation of certain rights to Obligor as an authorized user of the Coinbase Account (the "Coinbase Agreement"). In the event of any conflict between the terms of this Agreement and the terms and conditions of the Coinbase Agreement governing the relationship between Lender on the one hand, and Obligor on the other, the terms and conditions of this Agreement shall govern and control, and Obligor shall take all actions requested by Lender in order to give full force and effect to this Agreement notwithstanding anything to the contrary in the Coinbase Agreement. Obligor shall not withdraw or transfer or authorize any other person or entity to withdraw or transfer any assets from the Coinbase Account without the prior written consent of Lender. Should the market value of the cryptocurrency (and other digital assets approved by Lender) deposited into the Coinbase Account exceed 150% of the Outstanding

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

Obligations, Obligor shall be permitted to make withdrawals from the Coinbase Account in an amount which, after such withdrawal, maintains at least a market value of at least 125% of the Outstanding Obligations.

(b)     So long as no Event of Default has occurred and is continuing hereunder, Obligor may trade and sell assets in the Coinbase Account without the prior written consent of Lender, provided that any trades are in exchange solely for Bitcoin, Ethereum, or Stablecoin currency of USD, British Pound, Euro, Japanese Yen, AUD, or CAD and the proceeds of any assets sold or traded (in whatever form) are deposited in or credited to the Coinbase Account contemporaneously with such sale or trade.

(c)     In the event Coinbase provides check writing, line of credit or credit card privileges under the Coinbase Account ("Credit Options"), Obligor covenants and agrees that it shall not utilize any Credit Option in any manner whatsoever.

(d)     Obligor covenants and agrees to promptly notify Lender in the event any party other than Lender asserts or claims a lien or encumbrance against the Coinbase Account or any of the other Collateral.

(e)     Obligor shall pay to or reimburse Lender, on demand, any and all costs and expenses, including without limitation, reasonable attorneys' fees, incurred by Lender under the terms of the Coinbase Agreement, incurred in connection with the preparation, execution, delivery, amendment, administration, waiver, enforcement and performance of this Agreement, the Coinbase Agreement and the related documents, or incurred in connection with the protection of its rights under this Agreement or the Coinbase Agreement or any action or proceeding relating to this Agreement or the Coinbase Agreement.

(f)     Obligor covenants and agrees that it will not permit Coinbase to enter into a Coinbase Agreement with respect to the Coinbase Account with any party, other than Lender, or otherwise authorize or permit Coinbase to agree with any other party to comply with entitlement orders concerning the Coinbase Account originated by such party.

(g)     Obligor covenants and agrees that it shall cause Coinbase to report all items of income, gain, expense or loss relating to the Coinbase Account to the applicable taxing authorities under Obligor's social security number. In the event any item of income, gain, expense or loss with respect to the Coinbase Account or any of the other Collateral is mistakenly reported to the Internal Revenue Service or any state or local taxing authority under the name or tax identification number of Lender, Obligor shall assist Lender in having such income, gain, expense or loss properly attributed under the name and social security number of Obligor and Obligor shall reimburse Lender for all costs and expenses incurred by Lender in connection with any corrections related to such mistaken reporting.

Bodman_17559263_5

DocuSign Envelope ID: FE0DB556-CED7-44A4-B9A7-79006EDB21E4

**Obligor:**

*Adam Bignell*

ADAM ROYCE BIGNELL, individually

15

Bodman_17559263_5

# Exhibit C

| | |
|---|---|
| FRANKLIN CAPITAL GROUP, LLC,<br>a Michigan limited liability company, | Case No. 2022-197260-CB |
| Plaintiff, | Hon. Michael Warren |
| v. | **CONFESSED JUDGMENT** |
| SAHB ENERGY, LLC, a Michigan limited<br>liability company, and ADAM BIGNELL, an<br>individual, | |
| Defendants. | |

---

BODMAN PLC
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 West Big Beaver Road, Suite 500
Troy, Michigan 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiff*

---

## CONFESSED JUDGMENT

At a session of said Court, held in the
Oakland County Circuit Court, State of Michigan

on 12/14/2022 , 2022

MICHAEL WARREN
PRESENT: Hon. _____
Oakland Circuit Court Judge

Counsel for plaintiff appeared before the Court and demonstrated that SAHB Energy, LLC and Adam Bignell ("defendants") consented and confessed to the entry of this Confessed Judgment ("Judgment"). Counsel for plaintiff further demonstrated that defendants waived any requirement that the Court make any specific findings to support entry of this Judgment and their rights to appeal. Additionally, the Court is otherwise satisfied that entry of this Judgment is justified.

Having been otherwise fully advised on the premises;

IT IS HEREBY ORDERED AND ADJUDGED that Franklin Capital Group, LLC has a judgment against defendants in the amount of $1,105,754.02, representing the current outstanding indebtedness due and owing under the loan agreements between the parties. This Judgment shall accrue interest at the contractual rate in place at the time of entry.

IT IS FURTHER ORDERED AND ADJUDGED that this Judgment shall be effective and enforceable immediately upon entry. Defendants shall have no right to appeal this Judgment pursuant to their waiver of such rights.

This is a final order that resolves the last pending claim and closes the case.

IT IS SO ORDERED.

/s/ Michael Warren          la
Hon. _____

Dated: December 14, 2022

2

4890-4096-1342.v1

# Exhibit D

FRANKLIN CAPITAL MANAGEMENT,
LLC, a Michigan limited liability company,

      Plaintiff,

v.

SAHB ENERGY, LLC, a Michigan limited
liability company, and ADAM BIGNELL, an
individual,

      Defendants.

Case No. 2022-197261-CB

Hon. Michael Warren

**CONFESSED JUDGMENT**

---

BODMAN PLC
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 West Big Beaver Road, Suite 500
Troy, Michigan 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiff*

---

## CONFESSED JUDGMENT

At a session of said Court, held in the
Oakland County Circuit Court, State of Michigan
12/14/2022
on _____, 2022

PRESENT: Hon. MICHAEL WARREN
_____
Oakland Circuit Court Judge

Counsel for plaintiff appeared before the Court and demonstrated that SAHB Energy, LLC and Adam Bignell ("defendants") consented and confessed to the entry of this Confessed Judgment ("Judgment"). Counsel for plaintiff further demonstrated that defendants waived any requirement that the Court make any specific findings to support entry of this Judgment and their rights to appeal. Additionally, the Court is otherwise satisfied that entry of this Judgment is justified.

Having been otherwise fully advised on the premises;

IT IS HEREBY ORDERED AND ADJUDGED that Franklin Capital Management, LLC has a judgment against defendants in the amount of $38,141.78, representing the current outstanding indebtedness due and owing under the loan agreements between the parties. This Judgment shall accrue interest at the contractual rate in place at the time of entry.

IT IS FURTHER ORDERED AND ADJUDGED that this Judgment shall be effective and enforceable immediately upon entry. Defendants shall have no right to appeal this Judgment pursuant to their waiver of such rights.

This is a final order that resolves the last pending claim and closes the case.

IT IS SO ORDERED.

/s/ Michael Warren          la
_____
Hon.

Dated: December 14, 2022

4877-2126-2910.v1

# Exhibit E

RECEIVED
OAKLAND COUNTY
REGISTER OF DEEDS

2023 JAN 13 PM 12: 03

For us

007441    Liber 58383    Page 699    UCC #
1/20/2023    2:01:52 PM    Receipt #000006032
$21.00 Misc Recording
$4.00    Remonumentation
$5.00    Automation
$0.0 Transfer Tax
PAID RECORDED — Oakland County, MI
Lisa Brown, Clerk/Register of Deeds

Original - Register of deeds
1st copy - Court
2nd copy - Judgment creditor
3rd copy - Judgment debtor
4th copy - Return of service

Approved, SCAO

| STATE OF MICHIGAN JUDICIAL DISTRICT 6th JUDICIAL CIRCUIT | NOTICE OF JUDGMENT LIEN | CASE NO. 2022-197261-CB |

**Court address**                                    **Court telephone no.**

1200 N. Telegraph, Pontiac, MI 48341                    (248) 858-0344

| Plaintiff name Franklin Capital Management, LLC | v | Defendant name Sahb Energy, LLC and Adam Bignell |

| Judgment creditor's name and address Franklin Capital Management, LLC | Judgment debtor's name and address Adam R. Bignell |

Last 4 digits of social security no. or full tax identification no.
XXX-XX-0413

| Judgment creditor's attorney, bar no., address, and telephone no. J. Adam Behrendt (P58607), Bodman PLC 201 W. Big Beaver Road, Suite 500 Troy, MI 48084 (248) 743-6000 | Judgment debtor's attorney, bar no., address, and telephone no. |

1. I am recording a judgment lien with the register of deeds in Oakland County _____ County against the judgment debtor's current or future interest in real property.
2. The current balance due on the judgment is $ 38,329.68 .
3. The judgment was entered on December 14, 2022 and expires December 14, 2032 .
4. Except as otherwise prescribed by statute, this judgment lien expires 5 years after the date it is recorded with the register of deeds or when the underlying judgment expires, whichever is earlier.

1/5/2023                              /s/ J. Adam Behrendt P58607
Date                                  Signature of judgment creditor/judgment creditor's attorney

### CERTIFICATION

I certify that the above notice of judgment lien has been filed and includes the information required by MCL 600.2805(1).

Lisa Brown
Clerk of the Court: _____

1/6/2023                              /s/ C. Tucker
Date                                  Signed by: _____
                                      Clerk/Deputy clerk

When recorded, return to   J. Adam Behrendt (P58607), Bodman PLC
                           201 W. Big Beaver Road, Suite 500, Troy, MI 48084

MC 94   (6/17)   NOTICE OF JUDGMENT LIEN                                    MCL 600.2805

For use by Register of Deeds

007442    Liber 58383    Page 701    UCC #
1/20/2023    2:01:52 PM    Receipt #000006032
$21.00 Misc Recording
$4.00    Remonumentation
$5.00    Automation
$0.0 Transfer Tax
PAID RECORDED – Oakland County, MI
Lisa Brown, Clerk/Register of Deeds

Approved, SCAO

| | Original - Register of deeds | |
| | 1st copy - Court | |
| | 2nd copy - Judgment creditor | |

3rd copy - Judgment debtor
4th copy - Return of service

| STATE OF MICHIGAN JUDICIAL DISTRICT 6th JUDICIAL CIRCUIT | NOTICE OF JUDGMENT LIEN | CASE NO. 2022-197260-CB |
| --- | --- | --- |

Court address
1200 N. Telegraph, Pontiac, MI 48341

Court telephone no.
(248) 858-0344

Plaintiff name
Franklin Capital Group, LLC

v

Defendant name
Sahb Energy, LLC and Adam Bignell

Judgment creditor's name and address
Franklin Capital Group, LLC

Judgment debtor's name and address
Adam R. Bignell

Last 4 digits of social security no. or full tax identification no.
XXX-XX-0413

Judgment creditor's attorney, bar no., address, and telephone no.
J. Adam Behrendt (P58607), Bodman PLC
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000

Judgment debtor's attorney, bar no., address, and telephone no.

1. I am recording a judgment lien with the register of deeds in Oakland County _____ County against the judgment debtor's current or future interest in real property.
2. The current balance due on the judgment is $ 1,111,201.48 .
3. The judgment was entered on December 14, 2022 and expires December 14, 2032 .
4. Except as otherwise prescribed by statute, this judgment lien expires 5 years after the date it is recorded with the register of deeds or when the underlying judgment expires, whichever is earlier.

1/5/2023
Date

/s/J. Adam Behrendt P58607
Signature of judgment creditor/judgment creditor's attorney

**CERTIFICATION**

I certify that the above notice of judgment lien has been filed and includes the information required by MCL 600.2805(1).

1/6/2023
Date

Clerk of the Court: Lisa Brown

Signed by: /s/ C. Tucker
Clerk/Deputy clerk

When recorded, return to J. Adam Behrendt (P58607), Bodman PLC
201 W. Big Beaver Road, Suite 500, Troy, MI 48084

MC 94 (6/17) NOTICE OF JUDGMENT LIEN    MCL 600.2805